UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIE LYLES,

      Plaintiff,

                          CASE NO. 05-CV-70335-DT

v.                    JUDGE GEORGE CARAM STEEH
                          MAGISTRATE JUDGE PAUL J. KOMIVES

SHANE JACKSON,

      Defendant.

_____/

**REPORT AND RECOMMENDATION REGARDING (1) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. Ent. 17); (2) PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT (Doc. Ent. 22) and (3) DEFENDANT'S MOTION FOR PROTECTIVE ORDER STAYING DISCOVERY (Doc. Ent. 24)**

Table of Contents

I.     RECOMMENDATION ................................................................. 2

II.    REPORT .......................................................................... 2
    A.     Background and Procedural History ................................................ 2
    B.     Defendant Jackson's Motion to Dismiss and Plaintiff's First and Second Amended Complaints ......... 3
    C.     The Details of Plaintiff's Second Amended Complaint .................................... 4
    D.     Defendant's Motion for Summary Judgment ........................................... 7
    E.     Applicable Law ................................................................ 8
         1.     Fed. R. Civ. P. 15 ("Amended and Supplemental Pleadings") ........................... 8
         2.     28 U.S.C. § 1915A (Screening) .................................................. 9
         3.     Fed. R. Civ. P. 56 ("Summary Judgment") ......................................... 10
    F.     The Court Should Deny Defendant's Motion for Summary Judgment .......................... 12
         1.     The facts as set forth in plaintiff's December 12, 2005 proposed amended complaint. ........ 13
         2.     There is a question of fact as to whether plaintiff's March 2, 2002 placement in segregation was based upon his membership in the MSTA or an MSP investigation. ...................... 22
    G.     The Court Should Grant Plaintiff's Motion for Leave to File an Amended Complaint. ................. 32
    H.     The Court Should Deny Defendant's Motion for Protective Order Staying Discovery. ................. 34

III.   NOTICE TO PARTIES REGARDING OBJECTIONS ................................................. 36

I.    **RECOMMENDATION:**   The Court should deny defendant's motion for summary judgment (Doc. Ent. 17).  Such denial should be without prejudice to refiling a dispositive motion once the issues raised by plaintiff's December 12, 2005 amended complaint are squarely before the Court.  Furthermore, the Court should grant plaintiff's motion for leave to amend complaint (Doc. Ent. 22).  Finally, the Court should deny defendant's motion for protective order staying discovery (Doc. Ent. 24).

II.   **REPORT:**

A.    **Background and Procedural History**

Plaintiff is currently incarcerated at Ernest C. Brooks Correctional Facility (LRF) in Muskegon Heights, Michigan.  On February 1, 2005, while incarcerated at Muskegon Correctional Facility (MCF), plaintiff Willie Lyles-Bey filed a 42 U.S.C. §§ 1983, 1985 civil rights complaint against defendant Shane Jackson, described as a Mound Correctional Facility (NRF) inspector and acting assistant deputy warden.  (Doc. Ent. 1 [Compl.] at 2 ¶¶ 2-3).  Plaintiff sues defendant in both his individual and official capacities.  Compl. at 2 ¶ 5.  He seeks declaratory, injunctive, compensatory and punitive relief.  He also seeks costs, expenses, judgment interest and attorney fees.  Compl. at 5.

The factual detail of plaintiff's original complaint is scant.  Plaintiff claims that defendant acted on the basis of plaintiff's religion.  Compl. at 2 ¶ 4.  He incorporates by reference a five-page May 5, 2002 letter sent to the ombudsman.  Compl. at 3.  He takes issue with defendant's involvement in his administrative proceedings.  Compl. at 3 ¶ 10.  He also notes that he was retained in administrative segregation.  Compl. at 4 ¶ 11.  He claims he was denied religiously-appropriate meals.  Compl. at 4 ¶ 13.

2

Plaintiff's first cause of action includes violations of the First Amendment (freedom of religion, freedom of speech, grievance redress, court access, freedom of association, retaliation) and his rights to due process and equal protection. Compl. at 3-4 ¶ 8-10. Plaintiff's second cause of action includes violation of his Eighth Amendment rights, as well as the state law claim of intentional infliction of emotional distress. Compl. at 2 ¶ 6, 4 ¶¶ 11-13.

Plaintiff is proceeding pro se and in forma pauperis. (Doc. Ent. 4). On April 12, 2005, Judge Steeh referred this case to me to conduct all pretrial proceedings. (Doc. Ent. 6).

**B.    Defendant Jackson's Motion to Dismiss and Plaintiff's First and Second Amended Complaints**

On June 3, 2005, defendant filed a Rule 12(b)(6) motion to dismiss for failure to state a claim. (Doc. Ent. 9). On August 5, 2005, plaintiff filed a response and an amended complaint. (Doc. Entries 11 and 12). On August 9, 2005, I entered an order striking plaintiff's August 5, 2005 amended complaint from the record, because plaintiff had not filed a "proof of service". (Doc. Ent. 13).

On August 19, 2005, plaintiff filed an amended verified complaint and demand for jury trial which sets forth an approximately three-page factual history. (Doc. Ent. 14 [Amend. Compl.] at 2-5 ¶¶ 7-32).[1] Plaintiff alleges violations of First Amendment rights (including freedom of religion, freedom of speech, grievance redress, access to courts, freedom of association and retaliation), his rights to due process and equal protection, and his Eighth Amendment right against cruel and unusual punishment. Amend. Compl. at 5-6 ¶¶ 34, 35, 37, 38. He seeks relief in the forms of a

---

[1]On October 14, 2005, I entered an order requiring plaintiff to file proof of service of his August 19, 2005 filing. (Doc. Ent. 15). On November 3, 2005, plaintiff filed a proof of service. (Doc. Ent. 16).

3

declaratory judgment, an injunction, compensatory damages, and punitive damages, as well as costs, expenses, and interest.  Amend. Compl. at 6-7 ¶¶ (a)-(f).

On November 15, 2005, I entered a report and recommendation regarding defendant's June 3, 2005 motion to dismiss.  (Doc. Ent. 18).  Specifically, I stated that plaintiff was entitled to amend his complaint as a matter of course and that his August 19, 2005 filing should be recognized based upon the November 3, 2005 certificate of service.  Also, I stated that the Court should deem moot defendant's June 3, 2005 motion to dismiss.

On December 7, 2005, Judge Steeh entered an order accepting my report and recommendation and denying defendant's June 3, 2005 motion to dismiss as moot.  (Doc. Ent. 21).

## C.     The Details of Plaintiff's Second Amended Complaint

Plaintiff's August 19, 2005, amended verified complaint and demand for jury trial sets forth an approximately three-page factual history.  (Doc. Ent. 14 [Amend. Compl.] ¶¶ 7-32).  On March 2, 2002, pursuant to a notice of intent to classify to administrative segregation, plaintiff was placed in administrative segregation.  Amend. Compl. ¶ 8.  An administrative hearing was held on March 7, 2002 regarding plaintiff's purported involvement in the alleged smuggling of a cell phone into NRF; however, plaintiff was not provided with the alleged evidence that defendant used against plaintiff, which deprived plaintiff of an effective and meaningful opportunity to defend himself.  Amend. Compl. ¶ 9.  The hearing officer claimed that plaintiff was under investigation by the police for smuggling at NRF; therefore, the hearing officer upheld the notice of intent.  Amend. Compl. ¶ 10.

According to plaintiff, prisoner Smith-Bey was found in possession of the cell phone and confessed that he had received the cell phone from a prisoner other than plaintiff.  Amend. Compl.

4

¶ 11.  The other prisoner committed suicide, because he was unable to avoid persistent homosexual advances from another Michigan Department of Corrections (MDOC) official.  Amend. Compl. ¶ 12.

Plaintiff is a member of the Moorish Science Temple of America (MSTA).  Plaintiff claims that, as a result of his religion and complaints he registered, he was "persecuted, harassed, abused by being illegally and unconstitutionally detained in administrative segregation several months after material evidence was available to defendant and other MDOC authorities, exonerating plaintiff of any impropriety regarding the smuggling of the alleged cell phone into NRF."  Amend. Compl. ¶ 13.

Plaintiff claims that cognizable evidence did not exist to warrant his transfer to administrative segregation and that defendant's denial of plaintiff's constitutional rights was based upon plaintiff's religion.  Amend. Compl. ¶ 14.  Even assuming that plaintiff's transfer to administrative segregation on the notice of intent and defendant's retaliatory motive were deemed reasonable, plaintiff claims his detention there was "substantially longer than warranted[.]" Amend. Compl. ¶ 15.[2]

The police investigation concluded without a finding or evidence to criminally implicate plaintiff.  Plaintiff claims that defendant knew or should have known that plaintiff was not involved in smuggling contraband into NRF.  Amend. Compl. ¶ 16.  However, plaintiff claims, defendant

---

[2]In his response to defendant's motion for a protective order staying discovery, plaintiff states: "[D]efendant created a situation where he involved members of a religious group called the [MSTA] and specifically named plaintiff as someone involved in the possession of a cell phone by another prisoner.  As a result of defendant's actions, plaintiff was placed in segregation and held long beyond a reasonable period to investigate and determine who may have been involved in the [possession] of the cell phone."  Doc. Ent. 25 at 2.

"knowingly held plaintiff in unlawful segregation/isolation under pretext that an investigation was underway." Plaintiff contends that "[b]ecause defendant harbored hatred and detestation for members of the MSTA, [defendant] availed himself of the subterfuge to inflict ruthless, reprehensible retaliation and religious persecution on plaintiff." Amend. Compl. ¶ 17. Plaintiff claims that, because defendant was involved in plaintiff's placement in administrative segregation, he should have been precluded from being on the Security Classification Committee (SCC). Amend. Compl. ¶ 19.[3] Plaintiff believes that, because nothing negative was contained in any of his evaluation reports, plaintiff "would have been returned to general population status, but for defendant's deep-seated hatred of plaintiff's religious beliefs and [affiliations], not to mention the exercise of his constitutional guarantees," as are addressed in plaintiff's grievances. Amend. Compl. ¶ 20. Defendant, plaintiff claims, "should have disqualified himself from presiding over any proceedings effecting plaintiff, especially where defendant ordered plaintiff's confinement to segregation." Amend. Compl. ¶ 21. Plaintiff claims he was deprived of his religious materials, personal hygienic necessities, and other property items during his confinement to unlawful segregation. Amend. Compl. ¶ 22. Plaintiff also claims he was denied showers "at the behest of defendant." Amend. Compl. ¶ 23.

Plaintiff claims that he was served pork - a food that is contrary to his dietary restriction as an MSTA member. Amend. Compl. ¶ 27. He further claims that his "legal correspondence (mysteriously) was delivered to him two (2) weeks after its postmark date." Amend. Compl. ¶ 28.

_____

[3]According to plaintiff, "[t]he SCC evaluates reports about a prisoner's behavior while confined to the segregation. After reviewing the reports of the prisoner's behavior, the SCC decides whether the prisoner can safely be managed under general prisoner population status." Amend. Compl. ¶ 19.

He also claims that "MDOC officials interfered with and destroyed some of [his] legal documents and work product prepared for contemplated litigation[,]" to impede plaintiff's access to courts. Amend. Compl. ¶ 29.

## D.     Defendant's Motion for Summary Judgment

On November 9, 2005, defendant filed a Rule 56(b) motion for summary judgment. (Doc. Ent. 17). Defendant argues: "The inmate's complaint should be declared frivolous, and judgment should be entered in favor of defendant since there has been no showing of the defendant's personal involvement in the complained-of actions and the inmate asserts claims lacking in basis in fact or law." Doc. Ent. 17 at 8, 11. Attached to defendant's motion are (A) the November 9, 2005 affidavit of Shane Jackson;[4] (B) MDOC PD 04.05.120, "Segregation Standards", effective 02/21/00;[5] and (c) MDOC PD 05.01.130, "Prisoner Security Classification", effective 07/15/02.

On November 15, 2005, I entered an order requiring that plaintiff file any response to this motion no later than January 10, 2006. (Doc. Ent. 19). On January 6, 2006, plaintiff filed a response in opposition to defendant's motion for summary judgment. (Doc. Ent. 29). Plaintiff argues that "defendant was personally involved in the violations and even initiated the violations." Doc. Ent. 29 at 1 ¶ 3. On January 30, 2006, plaintiff filed an appendix to be incorporated with pending motions. (Doc. Ent. 27). Among the attachments are (A) the January 2006 affidavit of

---

[4]On November 21, 2005, defendant filed an affidavit. (Doc. Ent. 20). It appears to be the same as Exhibit A to defendant's motion.

[5]MDOC Policy Directive 04.05.120 governs "Segregation Standards". The version attached to defendant's motion became effective February 21, 2000. That version was replaced by a version which became effective on February 14, 2005. The current version of this policy directive became effective March 27, 2006. This report and recommendation cites to the February 21, 2000 version, because it was the one in effect at the time of the events in question.

Daryl Smith Bey and (B) the Step II/Step III grievance appeal forms and Step III grievance responses for NRF grievances NRF-03-10-01145-01149-28E.

**E.    Applicable Law**

**1.    Fed. R. Civ. P. 15 ("Amended and Supplemental Pleadings")**

Federal Rule of Civil Procedure 15 sets forth rules regarding amended and supplemental pleadings.  With respect to amended pleadings, the rule states:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served.  Otherwise, a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Fed. R. Civ. P. 15(a).  "'The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.'"  *Foman v. Davis*, 371 U.S. 178, 181-182 (1962), quoting *Conley v. Gibson*, 355 U.S. 41, 48 (1957).

While "...the allegations of [a] pro se complaint [are held] to less stringent standards than formal pleadings drafted by lawyers..." *Haines v. Kerner*, 404 U.S. 519, 520 (1972), "[leave to amend] is by no means automatic.'"  *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993), quoting *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981).  "Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision."  *Hageman v. Signal L. P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir.1973), citing *Foman*, 371 U.S. at 182 (1962); accord *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993).  "[T]he grant of leave to amend the pleadings pursuant to

Rule 15(a) is within the discretion of the trial court." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971), citing *Foman*, 371 U.S. 178 (1962) (dictum).  However, the trial court must take into consideration any prejudice to the opposing party.  *Zenith Radio Corp.*, 401 U.S. at 330-331; 3 *Moore's Federal Practice*, § 15.14[1] at n.4 (Matthew Bender 3d ed.).

Aside from the factors elicited in the *Foman* and *Zenith* decisions, courts may evaluate the legal sufficiency of the proposed amended claim in deciding whether to grant leave to amend.  3 Moore's Federal Practice, § 15.15[1]-[3] (Matthew Bender 3d ed.).  "It is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992).  "Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."  *Id.*

"[T]he court should not dismiss the complaint for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief[.]'"  *Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 123 (2d Cir. 1991), citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Furthermore, the court "...should not deny leave to file a proposed amended complaint unless that same rigorous standard is met."  *Id.*  "This principle should be applied with particular strictness when the plaintiff seeks to file an amended complaint charging a violation of his civil rights[.]"  *Ricciuti*, 941 F.2d 119 at 123.

## 2.      28 U.S.C. § 1915A (Screening)

The *Foman* factor of futility of amendment is particularly important to analyzing a prisoner civil rights complaint, because the Court is required to screen such complaints *sua sponte*.  28 U.S.C. § 1915A states:

(a) Screening.--The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.

(b) Grounds for dismissal.--On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint--

(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or

(2) seeks monetary relief from a defendant who is immune from such relief.

(c) Definition.--As used in this section, the term "prisoner" means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program.

28 U.S.C. § 1915A.  "Section 1915A is restricted to prisoners who sue government entities, officers, or employees."  *McGore v. Wrigglesworth*, 114 F.3d 601, 608 (6th Cir. 1997).  "Further, § 1915A is applicable at the initial stage of the litigation...".  *Id.*

## 3.    Fed. R. Civ. P. 56 ("Summary Judgment")

Summary judgment, pursuant to Fed. R. Civ. P. 56, may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©.

A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties.

*Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis,* 542 P.2d 867, 872 (Wyo. 1975) (quoting BLACK'S LAW DICTIONARY 881 (6th ed.1979)).  "In evaluating a

10

motion for summary judgment we view all evidence in the light most favorable to Plaintiff . . . and assess the proof to determine whether there is a genuine need for trial." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1045 (6th Cir. 1998) (citations omitted).[6]

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986). The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party discharges that burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine triable issue. Fed. R. Civ. P. 56(e); *Gregg*, 801 F.2d at 861.

"Although the nonmoving party 'may not rest upon the mere allegations or denials' of his pleading, Fed. R. Civ. P. 56(e), a verified complaint . . . satisfies the burden of the nonmovant to respond." *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999).[7] "[A] verified complaint . . . would have the same force and effect as an affidavit and would give rise to genuine issues of material fact." *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992). However, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be

_____

[6]The Sixth Circuit cited both *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) in support of this statement.

[7]Plaintiff signed his complaints under penalty of perjury. *See* Doc. Entries 1 at 7, 12 at 7, and 14 at 7; 25 U.S.C. § 1746 ("Unsworn declarations under penalty of perjury"). However, it does not appear that the proposed amended complaint accompanying Doc. Ent. 22 is signed under penalty of perjury.

admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).  *See also Hamilton v. Roberts*, No. 97-1696, 1998 WL 639158, *5 (6th Cir. Sept. 10, 1998) (unpublished) (personal knowledge required); *Daniel v. Cox*, No. 96-5283, 1997 WL 234615, *2 (6th Cir. May 6, 1997) (unpublished) (conclusory assertions are insufficient for purposes of surviving summary judgment); *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (citing *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969)) (cannot consider hearsay evidence).

"Demonstration of simply 'metaphysical doubt as to the material facts' is insufficient." *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992), citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986),  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 246-250 (citations omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed. R. Civ. P. 50(a).  *Anderson*, 477 U.S. at 250.  Consequently, a non-movant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

## F.    The Court Should Deny Defendant's Motion for Summary Judgment

Defendant claims that plaintiff has asserted nine constitutional violations: "(1) violation of the right to freedom of religion, (2) violation of the right to freedom of speech, (3) violation of a right to grievance redress and access to the courts, (4) violation of the right to be free from unlawful

12

retaliation, (5) violation of the right to freedom of association, (6) violation of a right to due process, (7) violation of a right to the equal protection of the laws, (8) violation of the right to be free from cruel and unusual punishment, and (9) the existence of a conspiracy." According to defendant, "the claims are frivolous and should be summarily dismissed." Defendants characterize plaintiff's claims as related to his "classification, the continuation of that classification, and conditions to which [he] was allegedly subjected as an administrative segregation inmate." Doc. Ent. 17 at 7.

1.     **The facts as set forth in plaintiff's December 12, 2005 proposed amended complaint.**

        Prisoner Smith-Bey attended the MSTA. (12/12/05 Prop. Amend. Compl. Ex. 12 at 2 ¶ 9). On Saturday,[8] March 2, 2002, prisoner Smith-Bey, #205522, was found in possession of a cellular telephone. (12/12/05 Prop. Amend. Compl. Ex. 12 at 2 ¶ 8). He was immediately placed into administrative segregation. Doc. Ent. 27 App. A ¶ 1. On that day, prisoner Smith-Bey was escorted from segregation to see Inspector C. Jackson. Jackson apparently did not want to involve prisoners and asked Smith-Bey to tell Jackson which staff member(s) gave Smith-Bey the phone. If Smith-Bey gave Jackson the name(s), Jackson would dismiss Smith-Bey's assault tickets and return his stamps; however, Smith-Bey would still receive the dangerous contraband misconduct ticket. Smith-Bey informed Jackson that Smith-Bey did not get the cellular telephone from a staff member. (12/12/05 Prop. Amend. Compl. ¶¶ 6 & 23, Ex. 2).[9] Jackson then inquired about plaintiff. Smith-Bey stated, "nothing was up with [Lyles-Bey]." Jackson phoned the Control Center and instructed Sgt. Witcher to take plaintiff to the hole. Smith-Bey asked defendant why plaintiff was being locked

_____

        [8]March 2, 2002 was a Saturday.

        [9]Plaintiff's proposed amended complaint suggests that, during this conversation, Smith-Bey informed defendant that he received the cell phone from an inmate. (12/12/05 Prop. Amend. Compl. ¶ 44).

up.  Jackson explained that plaintiff knew about the cellular telephone.  Smith-Bey explained that

plaintiff did not know about it, and defendant said, "OK".  Jackson then phoned the Officer in

Housing Unit 4A and requested the names of the MSTA members with whom Smith-Bey and

plaintiff hung out.  Jackson then directed that King-El and Rivera-Bey[10] also be taken to the hole.

(12/12/05 Prop. Amend. Compl. ¶¶ 7 & 25, Ex. 2).  *See also* Doc. Ent. 27 App. A ¶ 2.  Smith-Bey

told Jackson that Smith-Bey had the cellular telephone and he accepted full responsibility for his

actions.[11]  However, Jackson stated "this was not good enough."  Jackson said he was "'shutting the

[M.S.T.A.] down on this location', because the last phone he found was also controlled by Moors,

and that there would no longer be any services for the [M.S.T.A.] held on this location."  Jackson

then sent Smith-Bey back to segregation.  (12/12/05 Prop. Amend. Compl. ¶ 8, Exhibits 2 and 3).[12]

*See also* (12/12/05 Prop. Amend. Compl. ¶¶ 44-48), Doc. Ent. 27 App. A ¶ 3.

      Sgt. Gill overheard the March 2, 2002 conversation between Smith-Bey and defendant

Jackson.  Gill advised plaintiff that "defendant was going to lock up all members of the [MSTA] if

---

[10]An April 22, 2002 intramural correspondence from plaintiff to RUM Konieczki suggests that Rivera-Bey was plaintiff's cell mate at the time of the events underlying the complaint. 12/12/05 Prop. Amend. Compl. Ex. 9.

[11]This is consistent with Smith-Bey's representation that "Lyles Bey, nor any other person who was segregated at that time related to this incident, knew that [Smith-Bey] was in possession of a cell phone.  Nor did any person segregated have anything to do with [Smith-Bey's] possessing the same."  Doc. Ent. 27 App. A ¶ 4.  Smith-Bey also states that "despite telling [defendant] Jackson from the onset that [he (Smith-Bey)] accept[ed] full responsibility for the phone, and that it was [his], [defendant Jackson] insisted that [Smith-Bey] give him the name of a staff person."  Doc. Ent. 27 App. A ¶ 5.

[12]According to plaintiff's May 5, 2002 letter to the Legislative Corrections Ombudsman, Inspectors Jackson and Wade issued the directive to lock up plaintiff, as well as prisoners Rivera Bey (#1346378), Hagood-Bey (#183904) and King El (#127317), based upon their religious affiliations and prisoner Smith-Bey's possession of a cellular phone.  (12/12/05 Prop. Amend. Compl. Ex. 12 at 2 ¶ 10).

Smith-Bey did not tell [Jackson] what he wanted to hear." (12/12/05 Prop. Amend. Compl. ¶ 11, Ex. 5). *See also* 12/12/05 Prop. Amend. Compl. ¶ 25.

That same day, plaintiff was placed in administrative segregation and issued a Notice of Intent to Classify to Administrative Segregation. (12/12/05 Prop. Amend. Compl. Ex. 12 at 1). The notice of intent stated, "Prisoner Lyles-Bey 4A-35U [was] taken to segregation for information obtaining possible involvement/connection with cell phone that was in possession of prisoner Smith-Bey #205522 per Inspector Jackson pending investigation." (12/12/05 Prop. Amend. Compl. ¶ 3).[13] On the same day, defendant Jackson ordered the MSTA's entire membership (Rivera-Bey, #146378; Hagood-Bey, #183904; King-El, #127317; Smith-Bey, #205522 and Cockrell, #245722) into segregation. (12/12/05 Prop. Amend. Compl. ¶ 5). Cockrell was immediately released, because he was not a MSTA member. (12/12/05 Prop. Amend. Compl. ¶ 5). *See also* 12/12/05 Prop. Amend. Compl. Ex. 12 ¶ 11.[14]

On Tuesday, March 5, 2002, prisoner Smith-Bey, #205522, while in segregation, "informed prison officials that prisoner O'Neal 189535 had given him the cell phone . . . which was foun[d] in his possession, and that prisoner O'Neal had told him that Inspector Wade had given him the cell

---

[13]Plaintiff claims he is not able to attach a legible copy of the notice of intent (presumably form CSJ-447) to his complaint. (12/12/05 Prop. Amend. Compl. ¶ 3). "A Notice of Intent to Classify to Segregation form (CSJ-447) shall be completed by appropriate staff to place a prisoner in segregation, except when placement is due to a major misconduct violation. . . . The hearing officer shall determine whether facts alleged in the Notice have been established by a preponderance of evidence. The SCC shall then decide whether the <u>facts</u> as found by the hearing officer establish a need for segregation pursuant to the standards set forth in this policy." MDOC PD 04.05.10 ("Segregation Standards"), effective 02/21/00, ¶ N.

[14]Plaintiff claims that certain prison staff members (Sgt. Gill, ARUM L. Evans, RUM Randall and ADW Wright) will confirm this allegation. (12/12/05 Prop. Amend. Compl. Ex. 12 ¶ 11).

15

phone for his personal use to call him."[15]   According to plaintiff, prison officials "refused to investigate the substance of prisoner Smith-Bey['s] allegation."  (12/12/05 Prop. Amend. Compl. Ex. 12 at 2 ¶ 1).  On the same day, prisoner Smith-Bey, #205522, was called to Control Central Center.  According to Smith-Bey:

> [Inspector C. Jackson] stated that now that [Smith-Bey] had the weekend to think about it, all the rest of the Moors could go if [Smith-Bey] told [Jackson] who gave [Smith-Bey] the phone.  Again [Smith-Bey] explained that [he] would accept the responsibility for [his] actions, and [Jackson] stated that the State Police wanted to talk to [Smith-Bey].  Then [Jackson] said [Sgt. Powell] [did not] want to see [Smith-Bey], and [Smith-Bey] was taken back to segregation.

(12/12/05 Prop. Amend. Compl. ¶ 9, Ex. 3).[16]  *See also* (12/12/05 Prop. Amend. Compl. ¶ 49).[17]

Plaintiff's segregation classification hearing was held on Thursday, March 7, 2002.  The reporting staff member was Sgt. Witcher and the hearing officer was A. Baerwalde.  Plaintiff was present at the hearing.  He did not request witnesses or documents.  According to the report (CSJ-446):[18]

---

[15]According to plaintiff, "[p]risoner O'Neal and Inspector Wade were engaged in a romantic homosexual relat[i]onship."  (12/12/05 Prop. Amend. Compl. Ex. 12 at 2 ¶ 1).

According to plaintiff, the prisoner who committed suicide "was a lover of Inspector Wade[.]"  Doc. Ent. 26 at 3.

In a January 2006 affidavit, Smith-Bey states that he "actually received the phone from prisoner O'Neal[,]" who told Smith-Bey "he (O'Neal) had received the phone from Inspector Wade."  Doc. Ent. 27 App. A ¶ 6.

[16]Plaintiff equates Inspector C. Jackson with defendant Shane Jackson.  (12/12/05 Prop. Amend. Compl. ¶ 9).

[17]According to plaintiff, defendant stated that if Smith-Bey "did not give [defendant] the information he wanted, he would lock up everyone in the membership of [MSTA]."  (12/12/05 Prop. Amend. Compl. ¶ 49).

[18]"The findings of the hearing officer and the decision of the SCC shall be recorded on the Segregation Classification Hearing Report form (CSJ-446), a copy of which shall be provided to the prisoner promptly after the SCC decision has been made."  MDOC PD 04.05.120 ("Segregation Standards"), effective 02/21/00, ¶ O.

16

It [was] found based on the prisoner identification number of 147944 that the name Lowles Bey was mistakenly recorded for the name of this prisoner, Lyles, in the memo from D/Sgt Powell [Michigan State Police (MSP)], as per records office, Mr. McMath, there is no one by the name of Lowles at this facility.  Based on the statement of D/Sgt Powell it is found that Mr. Lyles is currently under investigation by the [MSP] for suspected felonious behavior in connection with smuggling at the NRF facility as alleged by Sgt. Witcher.  Notice is upheld at this time.

(12/12/05 Prop. Amend. Compl. Ex. 1).  *See also* (12/12/05 Prop. Amend. Compl. ¶ 4).

On Friday, March 8, 2002, plaintiff was seen by an SCC[19] "consisting of Asst. Dep. Warden Wright and RUM Randall in relation to the alleged charges issued by Det. Sgt. Powell."  According to plaintiff, "[t]he SCC Committee advised [him] that due to him being a member of the M.S.T.A, he is directly responsible for the conduct of it's [sic] members, and that if he had no knowledge of it's [sic] members' criminal activities, he should have, and that he will remain in segregation pending [MSP] Investigation which was issued by Inspector Wade based upon alleged confidential sources provided to Sgt. Powell by Inspector Wade."  (12/12/05 Prop. Amend. Compl. Ex. 12 at 3 ¶ 13).  Plaintiff was to be placed into administrative segregation "[b]ased solely on the findings of the Hearings Officer[.]"  The March 8, 2002 classification committee signatures were by Wright and RUM F. Randall-Owens.  (12/12/05 Prop. Amend. Compl. Ex. 1).  According to plaintiff, "defendant conducted all security classification hearing[s] . . . even though he was personally involved in the . . . placement of plaintiff in segregation."  (12/12/05 Prop. Amend. Compl. ¶ 12, Ex. 6).

Plaintiff claims that he was denied "showers, phone calls and non-pork meals or substitutes[,]" while he was in segregation.  (12/12/05 Prop. Amend. Compl. ¶ 13, Ex. 7).  After

_____

[19]According to defendant Jackson, "[t]he SCC re-screens prisoners for security classification pursuant to MDOC policy and procedure."  Doc. Ent. 20 ¶ 8.

approximately one week of being denied showers, Sgt. Golston became aware of the fact that all

MSTA members who were locked up regarding the cellular phone matter had been denied showers.

Sgt. Golston got in touch with ADW A. Wright, and ADW Wright advised Golston "to give showers

to the prisoners who had been locked up for the cell phone situation." (12/12/05 Prop. Amend.

Compl. ¶ 14).

For approximately three (3) weeks, plaintiff "was deprived of shaving material, deodorant,

soap and toothpaste" "despite numerous request[s] to provide [plaintiff] access to obtain these items,

which were arbitrarily removed from [plaintiff's] personal property for the purposes to degrade

him." (12/12/05 Prop. Amend. Compl. Ex. 12 at 3).

In April 2002, prisoner Daryl Smith wrote to plaintiff. (12/12/05 Prop. Amend. Compl. ¶

6, Exhibits 2-3). In this letter, prisoner Smith discussed his March 2 and March 5, 2002 meetings

with Inspector Jackson. (12/12/05 Prop. Amend. Compl. Exhibits 2-3), (Doc. Ent. 29 Exhibits 1-2).

On April 11, 2002, A/ADW Jackson and ARUS L. Wyrick signed plaintiff's security

reclassification notice (CSJ-423).[20]   The notice notes that plaintiff was found guilty in a March 7,

2002 hearing of a notice of intent and that he was reclassified to administrative segregation. The

notice states that plaintiff would "forfeit any good time or disciplinary credits" and notes that

plaintiff "is a threat to the order and security of this facility." Plaintiff argues that he "had not been

cited for any rule infraction under [MDOC PD 03.03.105] or a guilty finding." (12/12/05 Prop.

Amend. Compl. ¶ 17; Ex. 10). On April 12, 2002, plaintiff completed a Step I grievance form.

---

[20]"The Security Classification Committee (SCC) shall complete a Security Reclassification
Notice form (CSJ-423) prior to reclassification to administrative segregation and indicate the reason
for the reclassification on the form." MDOC PD 04.05.120 ("Segregation Standards"), effective
02/21/00, ¶ L.

(12/12/05 Prop. Amend. Compl. ¶ 17, Ex. 11).

Plaintiff contends that, during April 2002, while in segregation, prisoner Crowley (#182627) "informed prison officials that Inspector Wade [had] sexually molested him and provided him with drugs." (12/12/05 Prop. Amend. Compl. Ex. 12 at 2 ¶ 2). *See also* 12/12/05 Prop. Amend. Compl. ¶ 36. On April 19, 2002, "prisoner O'Neal [#189535] committed suicide[.]" (12/12/05 Prop. Amend. Compl. Ex. 12 at 2 ¶ 3; ¶ 35). Plaintiff claims O'Neal did this because "he was uncomfortable with the homosexual relationship with Inspector Wade and being married." 12/12/05 Prop. Amend. Compl. ¶ 35. Prisoner Crawford (#143333), prisoner O'Neal's roommate, informed prison officials that O'Neal said he was engaged in "an ongoing sexual relationship with Inspector Wade and using a cell phone." (12/12/05 Prop. Amend. Compl. Ex. 12 at 2 ¶ 4).[21] Plaintiff claims that prison officials were aware of the evidence exonerating plaintiff but "continued to cover up relevant and material evidence which exonerated [him]." (12/12/05 Prop. Amend. Compl. Ex. 12 at 2 ¶ 6). Inspector Wade was suspended from NRF pending investigation, yet plaintiff was still held in segregation. (12/12/05 Prop. Amend. Compl. Ex. 12 at 2 ¶ 7).[22]

---

[21]Plaintiff alleges that prisoner O'Neal's wife, Patricia O'Neal, informed the Detroit News that she received calls from her husband via a cellular phone and that "her husband had called her early on the morning of his suicide and stated that he could no longer assume the homosexual relationship he had had with Inspector Wade." (12/12/05 Prop. Amend. Compl. Ex. 12 at 2 ¶¶ 5, 37).

[22]Plaintiff states that two cellular phones were "found in the possession of prisoners and, after investigation, those phones had a connection with Inspector Wade and his homosexual activities within the prison." Doc. Ent. 26 at 3. Allegedly, O'Neal's roommate "took and passed a polygraph test [concerning] the suicide and other matters which were related to cell phones being found inside the prison." Doc. Ent. 26 at 3. Plaintiff also claims that, prior to the suicide, O'Neal took a polygraph test and was found to be "telling the truth when he stated that he had had an ongoing homosexual relationship with [Inspector] Wade." Plaintiff also claims that Crowley (#182627) "took a polygraph test and the results were that he was also telling the truth." 12/12/05 Prop. Amend. Compl. ¶ 38.

Plaintiff was "denied access to his Holy Koran; deprived of a pork free substitute diet, legal documents, paper, pencil, telephone and stamps." When he asked for these items, he was told he would receive them in time. Plaintiff was deprived of these items for approximately six (6) weeks "based upon unfounded, unsubstantiated allegations of smuggling." (12/12/05 Prop. Amend. Compl. Ex. 12 at 3 ¶¶ 14-15). Plaintiff claims that prison officials intentionally issued pork items after plaintiff submitted six (6) requests for a pork free diet. (12/12/05 Prop. Amend. Compl. Ex. 12 at 3). According to plaintiff, his Holy Koran was missing when he received his personal property. (12/12/05 Prop. Amend. Compl. Ex. 12 at 4).[23]

While plaintiff was in segregation, he "explained to [segregation] staff [that] [he needed information] from [his property] to fill out P.E.R. [Parole Eligibility Report] papers." Plaintiff's property, which had been confiscated, included "an address book with the name and address of the person required for possible placement if some kind of parole consideration was granted." Plaintiff was informed that he needed an excess property hearing. According to plaintiff, he did not have too much property. (12/12/05 Prop. Amend. Compl. ¶ 15, Ex. 8). On or about April 22, 2002, plaintiff wrote to RUM Konieczki regarding whether plaintiff was in possession of "excess" property. He said he was concerned mainly with his lack of access to addresses. (12/12/05 Prop. Amend. Compl. Ex. 9). Plaintiff's property "was held without a hearing until [plaintiff's] release from temporary segregation status." (12/12/05 Prop. Amend. Compl. ¶ 16).

By an April 24, 2002 affidavit submitted to defendant, prisoner Smith sought "to exonerate

---

[23]MSTA is an MDOC recognized religious group. MDOC PD 05.03.150 ("Religious Beliefs and Practices of Prisoners"), effective 05/24/04, Attach. A. "[P]risoners belonging to these groups are allowed to possess religious personal property as indicated below in addition to religious reading material." *Id.* "Prisoners in segregation may possess and wear approved items only as set forth in PD 04.05.120 'Segregation Standards'." *Id.*

innocent prisoners presently being held in segregation for actions . . . which [he] alone committed."
(12/12/05 Prop. Amend. Compl. ¶ 10, Ex. 4).  He stated that "the incident in relation to me being
[in] possession of contraband, has nothing to do with prisoner Lyles Bey.  Nor was this prisoner [in]
anyway involved in my actions nor knew of [their] existence."  He further stated that "[his] actions
and conduct [were] done independently and no other prisoners took part, or [were] aware of [his]
actions in the matter in which [he] [is] not residing in segregation for."  (12/12/05 Prop. Amend.
Compl. ¶ 10, Ex. 4 ¶¶ 2, 4).  *See also* 12/12/05 Prop. Amend. Compl. Ex. 12 ¶ 12).

Plaintiff was released from segregation after serving sixty (60) days (approximately May
2002).  (12/12/05 Prop. Amend. Compl. Ex. 12 at 4 ¶ G).  Plaintiff states that "[a]ll charges were
subsequently dismissed against [him][,]" and contends that "the information utilized in releasing him
from segregation was known to prison officials 50 days prior to [him] being released.  Yet, prison
officials kept [him] in segregation under hostile conditions."  (12/12/05 Prop. Amend. Compl. Ex.
12 at 5 ¶ I).

On the day of his release, he expressed to prison officials his intention to file a lawsuit and
grievance.  Plaintiff "was scheduled to be transferred 3 days later as a result of filing said grievance,
and exposing said coverup of Inspector Wade, Sgt. Witcher and Sgt. Brandt."  (12/12/05 Prop.
Amend. Compl. Ex. 12 at 4 ¶ G).  Plaintiff was being transferred from NRF, where he was allegedly
a model prisoner and was scheduled to go before the parole board, to Ojibway Correctional Facility
(OCF).  (12/12/05 Prop. Amend. Compl. Ex. 12 at 5).

In a May 5, 2002 letter to the Legislative Corrections Ombudsman, plaintiff alleged that the
transfer is retaliatory in nature.  The letter was received on May 28, 2002.  (12/12/05 Prop. Amend.
Compl. ¶ 18, Ex. 12).  In a letter dated September 12, 2003, Keith Barber, Chief Investigator of the

Office of Legislative Corrections Ombudsman, wrote to plaintiff at OCF.  12/12/05 Prop. Amend.

Compl. Ex. 13.

**2.    There is a question of fact as to whether plaintiff's March 2, 2002 placement in segregation was based upon his membership in the MSTA or an MSP investigation.**

**a.    Plaintiff's First Amendment claims**

In his May 5, 2002 letter to the Legislative Corrections Ombudsman, plaintiff claimed he

was not questioned or interviewed by the MSP.  (12/12/05 Prop. Amend. Compl. Ex. 12 at 4 ¶ A).

He claimed he was not issued "any documentation[,] evidence or information otherwise directly

linking him to any alleged smuggling at [NRF][.]" He also claimed that NRF officials have not

"produced any material to implicate, indicate or otherwise connect [plaintiff] with any illegal

activities other than Inspector Wade's false and misleading sources that were ultimately used to

coverup his own criminal misconduct, which were later exposed, and is now under [MSP

investigation]."  (12/12/05 Prop. Amend. Compl. Ex. 12 at 4 ¶ B).  Plaintiff claimed that the alleged

sources implicating him, "came directly from Inspector Wade, [who], in fact, used [plaintiff] as a

pawn to coverup his criminal activities by supplying Det. Sgt. Powell erroneous and [misleading]

information."  (12/12/05 Prop. Amend. Compl. Ex. 12 at 4 ¶ C).  According to plaintiff, he offered

to undergo a lie detector test and to pay for its costs but was denied.  (12/12/05 Prop. Amend.

Compl. Ex. 12 at 4 ¶ D).  Plaintiff claimed that the "Classification Committee recommended that

all [of plaintiff's] Good-Time or Disciplinary Credits be forfeited before [he] was officially found

guilty of any misconduct.  The recommendation was made by [ADW] Jackson[,] [who] was alleged

to be in charge of the investigation."  Plaintiff claims this investigation "was used as a pretense to

place [him] in segregation based upon being a member of the [MSTA]."  (12/12/05 Prop. Amend.

Compl. Ex. 12 at 4 ¶ F).

In his August 19, 2005 amended complaint, plaintiff claims that "[o]n March 2, 2002, [he] was confined to administrative segregation, pursuant to a Notice of Intent to Classify to Administrative Segregation . . . at the behest of defendant." Amend. Compl. ¶ 8. Plaintiff alleges violations of his First Amendment rights to freedom of religion, freedom of speech, grievance redress, access to courts and freedom of association. Amend. Compl. ¶ 34. He also mentions retaliation. Amend. Compl. ¶ 37.

In his December 12, 2005 proposed amended complaint, plaintiff alleges, Gill advised plaintiff that "defendant was going to lock up all members of the [MSTA] if Smith-Bey did not tell [Jackson] what he wanted to hear." (12/12/05 Prop. Amend. Compl. ¶ 11, Ex. 5). Within the first cause of action, plaintiff claims that defendant "called Sgt. Witcher and ordered him to write Notice of Intents on all members of the [MSTA] and placed them in temporary segregation pending a State Police investigation[,]" and "Sgt. Witcher agreed with Inspector Jackson and other employees to deny plaintiff of his First Amendment right in an effort to cause the disbanding of plaintiff's religious group, Moorish Science Temple of America." (12/12/05 Prop. Amend. Compl. ¶¶ 24, 26). Plaintiff alleges that defendant Jackson knowingly initiated a false notice of intent against most MSTA members "to shut down the [MSTA]." (12/12/05 Prop. Amend. Compl. ¶¶ 27, 30). Plaintiff claims that "[t]he purpose of Inspector Jackson's actions was to disband the [MSTA] at [NRF]. This is especially true since Smith-Bey, who was charged with possession of the cell phone, received sanctions that ended long before plaintiff was released from segregation." (12/12/05 Prop. Amend. Compl. ¶ 29). Plaintiff further claims that during a March 2, 2002 conversation, defendant told prisoner Smith-Bey that he (Jackson) was shutting down the MSTA at NRF. (12/12/05 Prop. Amend. Compl. ¶ 48). Plaintiff claims that defendant "used his power and authority to attack the

23

[MSTA] to cover up the improper acts of his fellow inspector, Inspector Wade, who [defendant] knew was homosexual and used his position of authority to force prisoners to participate in acts of homosexual sex." (12/12/05 Prop. Amend. Compl. ¶ 50). Plaintiff claims that defendant's acts "were intentional, knowing and calculated. A[n]d, after plaintiff was released from segregation, he was transferred in retaliation." (12/12/05 Prop. Amend. Compl. ¶ 51).

**b.    Parties' arguments**

With regard to plaintiff's retaliation claim, defendant contends that plaintiff "fails to identify the 'protected conduct' he allegedly engaged in and makes no showing of [defendant's] commission of an 'adverse act' motivated by the exercise of 'protected conduct.'" Doc. Ent. 17 at 12. According to defendant, "[t]his case presents a classic example of speculative motives regarding a legitimate undertaking." Doc. Ent. 17 at 12.

In response to plaintiff's motion to amend, defendant contends that "the proposed amendments do not demonstrate that Defendant Jackson issued the Notice of Intent or conducted the hearing that resulted in the plaintiff's administrative segregation placement; that Defendant Jackson played any role in the property and privileges the plaintiff received while housed in administrative segregation, or that Defendant Jackson's membership on the [SCC] operated to deprive the plaintiff of a federally secured right[.]" Doc. Ent. 23 at 7.

In response to defendant's motion for summary judgment, plaintiff states that "defendant was personally involved in the violations and even initiated the violations." Doc. Ent. 29 at 1 ¶ 3. Relying upon the content of prisoner Smith-Bey's April 2002 letter, plaintiff claims "the specific [purpose] of defendant's actions [was] to 'shut down' the [MSTA] at [NRF][.]" Doc. Ent. 29 at 4. Plaintiff claims he was engaged in the constitutionally protected right of exercising his religious

faith.  Doc. Ent. 29 at 4.  The adverse action, he contends, was prolonged segregation based upon faulty and false information, resulting in the deprivation of the benefit of practicing his religion (deprivation of religiously appropriate meals and the Holy Koran) and the deprivation of writing materials and legal materials.  Doc. Ent. 29 at 4-5.

He also maintains that the exercise of his religious faith was a substantial and motivating factor in these described adverse actions, as evidenced by Smith-Bey's representation that defendant stated "it was his intent to 'shut down' the [MSTA] at [NRF]."  Doc. Ent. 29 at 5.  Citing MDOC PD 05.03.150 ("Religious Beliefs and Practices of Prisoners"), ¶ FF,[24] plaintiff claims that only the warden has the authority to suspend or shut down the MSTA and such discretion is not unfettered.  Doc. Ent. 29 at 5, 6.  In a First Amendment context, the Sixth Circuit has stated that "the circumstances of prison life may require some restrictions on prisoners' exercise of their religious beliefs."  *Walker v. Mintzes*, 771 F.2d 920, 929 (6th Cir. 1985).  Plaintiff claims "[t]here was no need to restrict plaintiff in his religious beliefs since the inmate who had possession of the cell phone admitted that it was his and also accepted full responsibility for its possession. Yet defendant wanted to punish plaintiff and 'shut down' the [MSTA] by falsely and maliciously involving the entire religion group in the prison infraction or criminal act of Smith-Bey."  Doc. Ent. 29 at 6.  Based upon defendant's actions (outrage; having plaintiff, King-El and Rivera-Bey segregated; and stating he would "shut down" the MSTA) in response to Smith-Bey's refusal to offer the name of an MDOC employee (as relayed in Smith-Bey's April 2002 letter), in addition to the fact that MDOC PD 05.03.150 did not give plaintiff the authority to shut down the MSTA, plaintiff claims "it was

---

[24]"[T]he Warden may suspend religious group services and activities if holding the service or activity would constitute a threat to the order and security of the institution."  MDOC PD 05.03.150 ("Religious Beliefs and Practices of Prisoners"), effective 05.03.150, ¶¶ FF.

25

obvious that [defendant] wanted to involve[] plaintiff and the other members of the [MSTA] at [NRF]." Doc. Ent. 29 at 6. Plaintiff contends that his "entire [classification] process was flawed[.]" Doc. Ent. 29 at 7. According to plaintiff, defendant "concocted and created the situation when Smith-Bey refused to fabricate an employee who provided him with the cell phone[.]" Doc. Ent. 29 at 7. According to Smith-Bey, plaintiff states, "this triggered an animus against the [MSTA] and especially plaintiff[.]" Doc. Ent. 29 at 7. Plaintiff also claims that O'Neal's April 19, 2002 suicide made defendant's other motive for attacking MSTA and specifically plaintiff apparent - use plaintiff and MSTA as a "scapegoat to cover up and disguise the illegal and wrongdoings of . . . Inspector Wade who was involved in homosexual encounters with prisoners[.]" Doc. Ent. 29 at 7. According to plaintiff, this is substantiated by the MSP investigation and O'Neal's roommate. Doc. Ent. 29 at 7. Plaintiff claims "[i]t is clear that defendant's aim and actions were designed to deny plaintiff his First Amendment rights and 'shut down' the [MSTA][.]" Doc. Ent. 29 at 8.

**c.     There is a question of fact as to what initiated plaintiff's classification into administrative segregation - the causation element of a First Amendment retaliation claim.**

The elements of a retaliation claim under the First Amendment standard are "...(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two–that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter,* 175 F. 3d at 394, citing *Bloch v. Ribar,* 156 F.3d 673, 678 (6th Cir. 1998); *Lewis v. ACB Business Services, Inc.,* 135 F.3d 389, 406 (6th Cir. 1998); *Penny v. United Parcel Serv.,* 128 F.3d 408, 417 (6th Cir.1997); and *Yellow Freight Sys., Inc. v. Reich,* 27 F.3d 1133, 1138 (6th Cir. 1994). "If the defendant can show that he would

have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Thaddeus-X* at 399.

Although subject to some limitations, plaintiff has a First Amendment right to the free exercise of religion while in prison. "Under the First Amendment, prisoners retain a right to free exercise of religion, although that right is subject to legitimate penological demands of the state." *Conyers v. Abitz*, 416 F.3d 580, 585 (7th Cir. 2005) (citing *Tarpley v. Allen County, Ind.*, 312 F.3d 895, 898 (7th Cir.2002)).  "[E]ven though valid penological objectives may necessitate some restrictions on the exercise of a prisoner's constitutional rights, it is by now well established that incarceration in a penal institution does not extinguish the protections on the free exercise of religion afforded by the First Amendment." *Bakr v. Johnson*, No. 95-2348, 1997 WL 428903, **2 (6th Cir. July 30, 1997) (internal and external citations omitted).  The adverse action is the March 2, 2002 placement into administrative segregation which lasted sixty (60) days. *Brown v. Crowley*, 312 F.3d 782, 789 (6th Cir. 2002) ("placing a prisoner in administrative segregation is an adverse action.") (citing *Herron v. Harrison*, 203 F.3d 410, 416 (6th Cir. 2000) and *Thaddeus-X*, 175 F.3d at 396)).

In the instant case, the parties present two different theories for the reason underlying plaintiff's assignment to segregation.  Plaintiff has alleged a causal connection between the protected activity of exercising his religious faith and the adverse action of being placed into segregation. *See, i.e.*, Amend. Compl. ¶ 14, (12/12/05 Prop. Amend. Compl. ¶ 27).  Plaintiff claims that, in light of the MSP investigation's conclusion, "[d]efendant knew or reasonably [should] have known that plaintiff had no involvement in smuggling contraband into NRF." Amend. Compl. ¶ 16.  He further claims "defendant knowingly held plaintiff in unlawful segregation/isolation under pretext that an investigation was underway."  Amend. Compl. ¶ 17. *See also* Amend. Compl. ¶ 36.

27

On the other hand, defendant argues that "[s]ince [d]efendant Jackson did not issue the NOI and did not conduct the administrative hearing resulting in the classification, the plaintiff can make no showing of Jackson's personal involvement in that activity." Doc. Ent. 17 at 10. Defendant claims that he "as required by MDOC policy, notified appropriate prison staff that the plaintiff was being investigated by the [MSP] for suspected felonious behavior. That staff person issued a Notice of Intent in accordance with MDOC Policy Directive 04.05.120 'Segregation Standards' and the plaintiff received regular reviews of the classification by a committee." Doc. Ent. 17 at 12-13.

There is a question of fact as to the impetus for plaintiff's placement in administrative segregation. "A prisoner may be classified to administrative segregation if . . . [t]he prisoner is under investigation by an outside authority for suspected felonious behavior." MDOC PD 04.05.120 ("Segregation Standards"), effective 02/21/00, ¶ D(4).[25] Required hearings are discussed at ¶¶ J-R. In relevant part, the policy provides that "A prisoner shall be given a hearing pursuant to Administrative Rule 791.3315 by a hearing officer from the Office of Policy and Hearings before being classified to or placed in any form of segregation except voluntary protective segregation or temporary segregation." MDOC PD 04.05.120 ("Segregation Standards"), effective 02/21/00, ¶ J.

The parties dispute who "caused" plaintiff to be classified to administrative segregation. In his motion, defendant maintains that he was not personally involved in plaintiff's assignment to administrative segregation, because he did not issue the notice of intent and did not conduct the administrative segregation hearing which resulted in plaintiff's classification to administrative segregation. Doc. Ent. 17 at 9-10. Although defendant's motion does not elaborate on the identity

---

[25]Defendant represents that "[t]he policy directive mandates the classification when an inmate is being investigated by an outside authority for suspected felonious behavior." Doc. Ent. 17 at 9.

of the "staff person" who issued the notice of intent, it certainly implies that it was someone other than defendant. Doc. Ent. 17 at 12-13.

In a November 9, 2005 affidavit, defendant Jackson stated that his duties as an NRF Inspector include acting as a liaison to the MSP. Doc. Ent. 20 at ¶ 2. As an MSP liaison, defendant provides "support when the agency conducts investigations into possible criminal activity at [NRF]," conducts "such tasks as setting up prisoner and/or staff interviews as requested by the [MSP]," and retrieves "information needed by the agency, etc." Doc. Ent. 20 at ¶ 3. According to defendant:

> In March 2002 the [MSP] conducted an investigation into the smuggling of a cellular telephone into NRF. The plaintiff . . . was included within that investigation. [Defendant Jackson's] role in the matter was as follows: [He] advised Sgt. Witcher of the [MSP] investigation, turned the cellular telephone in question over to [MSP] personnel and waited to obtain any information, such as telephone numbers, the [MSP] could retrieve from the telephone.

Doc. Ent. 20 at ¶¶ 5, 6. Although defendant's affidavit claims that he advised Sgt. Witcher of the MSP investigation, it does not mention who caused plaintiff to be placed into administrative segregation. Doc. Ent. 20 ¶ 6.

In plaintiff's proposed amended complaint, plaintiff alleges that defendant initiated plaintiff's segregation. (12/12/05 Prop. Amend. Compl. ¶¶ 27, 30, 33). Furthermore, plaintiff's response states that Sgt. Witcher wrote the notice of intent and that defendant had initiated it:

> According to Smith-Bey, the notice of intent was suggested and instigated by defendant. In fact, he called Sgt. Witcher and told him to segregate plaintiff. Without the order from defendant, Sgt. Witcher would not have written the notice of intent.
> . . .
> defendant became outraged and immediately called and told Sgt. Witcher to lock up plaintiff. Sgt. Witcher wrote a notice of intent and locked plaintiff up for an alleged State Police investigation.

Doc. Ent. 29 at 4, 6. Plaintiff further states that defendant "initiated a notice of intent." Doc. Ent.

29

29 at 6.

Against this backdrop, there is the January 2006 affidavit of prisoner Smith who asserts that during his March 2, 2002 meeting with defendant, defendant "called the housing unit where [Smith] locked and asked someone in the housing unit for names of all inmates in the [MSTA] [with] who[m] [Smith] had regular contact[]; and [defendant] ordered those prisoners taken to segregation as well." Doc. Ent. 27 App. A ¶ 2. Prisoner Smith's affidavit further states that defendant "stated that he was going to shut down [t]he [MSTA] at [NRF]." Doc. Ent. 27 App. A ¶ 3. Therefore, plaintiff has presented evidence which suggests that his March 2, 2002 placement into administrative segregation was based on his membership in the MSTA, as opposed to having been based on the MSP investigation.

Furthermore, there is no copy of the Notice of Intent form (CSJ-447), so it is unclear to the Court who signed this form.[26] However, even if Sgt. Witcher was the individual who signed the notice of intent, the absence of copies of the notice of intent and MSP investigation report in either parties' filings significantly hampers the Court's ability to rule out either parties' motive for plaintiff's assignment to administrative segregation. First, there is the issue of timing. Plaintiff claims he was placed into administrative segregation on March 2, 2002. Based upon the notes from the segregation classification hearing, it is clear that an MSP investigation existed at least as early as March 7, 2002. However, defendant's motion does not provide a specific date for the initiation of the investigation of plaintiff by the MSP - only that plaintiff "was so classified in March 2002". Doc. Ent. 17 at 7, 9-10. The date the MSP investigation was initiated is unclear, and defendant does

---

[26]Although his December 12, 2005 proposed amended complaint is not signed under penalty of perjury, plaintiff does state that he is not able to attach a legible copy of the notice of intent (presumably form CSJ-447) to his complaint. (12/12/05 Prop. Amend. Compl. ¶ 3).

not dispute that plaintiff was placed into administrative segregation on March 2, 2002. The time line is not made certain by defendant's affidavit, because it states that plaintiff was included within a March 2002 cellular phone smuggling investigation but does not state when defendant contacted Sgt. Witcher or when defendant turned the apprehended cellular telephone over to the MSP. Doc. Ent. 20 ¶¶ 5, 6. Neither does the hearing report clarify the sequence of events, because it does not give the date of the investigation report, the date of the investigator's interview with plaintiff, or the date of the statement from Sgt. Powell of the MSP. (12/12/05 Prop. Amend. Compl. Ex. 1).[27] Therefore, it is unclear whether the MSP investigation precipitated plaintiff's placement in segregation.

Second, the Court does not know the basis of the MSP investigation. A copy of the police report or the notice of intent might shed light on the basis of the MSP's investigation and why plaintiff was included in the MSP investigation. It is not clear whether defendant was simply trying to conduct an investigation by questioning the people with whom prisoner Smith normally associated (who just happen to be members of the MSTA) or whether this was an investigation directed at the membership of the MSTA. Even if Witcher signed the notice of intent,[28] the Court does not have the benefit of knowing Sgt. Witcher's reasons for issuing the notice of intent.

Plaintiff does quote from the notice of intent: "Prisoner Lyles-Bey . . . [was] taken to

---

[27]The hearing report does, however, acknowledge that five (5) others were being investigated. (12/12/05 Prop. Amend. Compl. Ex. 1). This would be consistent with plaintiff's allegation that five (5) others are (Rivera-Bey, #146378; Hagood-Bey, #183904; King-El, #127317; Smith-Bey, #205522 and Cockrell, #245722) were taken to segregation. (12/12/05 Prop. Amend. Compl. ¶ 5).

[28]As previously noted, "[a] Notice of Intent to Classify to Segregation form (CSJ-447) shall be completed by *appropriate staff* to place a prisoner in segregation, except when placement is due to a major misconduct violation." MDOC PD 04.05.120 ("Segregation Standards"), effective 02/21/00, ¶ N (emphasis added). Therefore, the policy does not suggest that notices of intent are always issued by the same person, i.e., the warden, the resident unit manager, etc.

segregation for information obtaining possible involvement/connection with cell phone that was in possession of prisoner Smith-Bey . . . per [defendant] pending investigation." (12/12/05 Prop. Amend. Compl. ¶ 3). However, this statement, while supporting the argument that an investigation existed on March 2, 2002, does not, alone, rule out plaintiff's theory that the investigation was a pretext and does not provide any detail regarding the basis of the MSP investigation.

In light of the foregoing, there is a question of fact as to the impetus for plaintiff's assignment to administrative segregation.

**G.     The Court Should Grant Plaintiff's Motion for Leave to File an Amended Complaint.**

On December 12, 2005, plaintiff filed a motion for leave to file an amended complaint. (Doc. Ent. 22). He claims that "the prior complaint was incomplete and did not state sufficient facts to support the claims in the complaint[,]" and "the purpose of this amen[d]ed complaint is to correct the deficiencies in the prior complaint." Doc. Ent. 22 at 1 ¶¶ 1-2. The eight-page proposed amended complaint, dated December 6, 2005, includes a factual history, ¶¶ 3-22, as well as counts of (I) common law conspiracy, ¶¶ 23-26; (II) abuse of process, ¶¶ 27-29; (III) procedural and substantive due process, ¶¶ 30-43; and (IV) First and Eighth Amendment violations, ¶¶ 44-50. The proposed amended complaint seeks declaratory relief, compensatory relief, punitive damages and any other relief deemed appropriate and necessary.[29]

---

[29]Attached to the proposed amended complaint are several exhibits, including a March 8, 2002 segregation classification hearing report (Ex. 1); a handwritten letter from prisoner Daryl Smith (Exhibits 2, 3); the April 24, 2002 sworn affidavit of Darryl Smith (#205522) (Ex. 4); ten Step I grievance forms (Exhibits 5-8, 11, 13a-13e); intramural correspondence from plaintiff to RUM Konieczki dated April 22, 2002 (Ex. 9); an April 11, 2002 security reclassification notice (Ex. 10); a May 5, 2002 letter from plaintiff to Charlene L. Lowrie, Legislative Corrections Ombudsman (Exhibit 12); a September 12, 2003 response from the Office of Legislative Corrections Ombudsman (Exhibit 13); and five Step II grievance appeal responses (Exhibits 14a-14e).

On December 16, 2005, defendant filed a response.  (Doc. Ent. 23).  He argues that "[l]eave to amend should be denied since the plaintiff failed to exercise due diligence, because amendment would be prejudicial to the defendant, and because additional amendment would be futile."  Doc. Ent. 23 at 5.

As to due diligence and prejudice, defendant argues that plaintiff "had ample opportunity to cure any pleading deficiencies[,]" when he filed his August 19, 2005 amended complaint.  Doc. Ent. 23 at 5.  Defendant also argues that he will be unduly prejudiced if plaintiff is not required to respond to a dispositive motion with a response and is permitted to respond to every dispositive motion with an amended complaint.  Doc. Ent. 23 at 5-6.  Defendant argues that "[t]he proposed amendments contain information that, presumably, the plaintiff has been privy to for years.  Defendant will be prejudiced if the plaintiff is permitted to respond to the defendant's potentially dispositive filings through complaint amendments that add no substantive value and offer nothing to contradict the factual and legal position set forth in the pending summary judgment motion."  Doc. Ent. 23 at 7.

As to futility, defendant contends that "the proposed amendments merely recite hearsay and opinion regarding other members of the [MSTA].  Those hearsay and opinion averments have no bearing on arguments presented in Defendant's pending summary judgment motion[.]"  Doc. Ent. 23 at 6.  Defendant argues that "the proposed amendments do not demonstrate that [d]efendant Jackson issued the Notice of Intent or conducted the hearing that resulted in the plaintiff's administrative segregation placement; that [d]efendant Jackson played any role in the property and privileges the plaintiff received while housed in administrative segregation, or that [d]efendant Jackson's membership on the [SCC] operated to deprive the plaintiff of . . . federally secured rights."

33

Doc. Ent. 23 at 7.

On January 13, 2006, plaintiff filed a reply, arguing that "defendant has not met [his] burden to have the Court deny a motion to amend." (Doc. Ent. 26 at 1 ¶ 3). He claims that "[t]he issues raised in defendant's motion for summary judgment will be cured with the amended complaint now pending for filing." Doc. Ent. 26 at 2. Plaintiff contends that defendant was aware of defendant's false accusation; defendant's retaliatory lock up of plaintiff and other MSTA members; and the link between the prisoner suicide, the cell phone in question and Inspector Wade. Therefore, he will not be prejudiced by the amendment. Doc. Ent. 26 at 3.

If the Court agrees with my conclusion that there is a question of material fact as to why plaintiff was placed into administrative segregation, then it should grant plaintiff's motion to amend and direct plaintiff to file a signed copy of his December 12, 2005 proposed amended complaint within a specified amount of time.

## H.   The Court Should Deny Defendant's Motion for Protective Order Staying Discovery.

On or about December 13, 2005, plaintiff served defendant with ten (10) requests for production of documents. (Doc. Ent. 24 Attach.). Request Nos. 1, 2 and 3 concern events predating the events underlying the instant case. Request Nos. 5, 7 and 8 specifically mention Inspector Wade and prisoner Shawn O'Neal (#189535). Request No. 6 concerns prisoner Crowley (#182627).[30] Request No. 10 concerns Kenneth Crawford (#143333).

Request Nos. 4 and 9 mention plaintiff and prisoners Daryl Smith (#205522); King-El

---

[30]Prisoner #182627 is assigned to Robert Flowers. *See* www.michigan.gov/corrections, "Offender Search".

(#127317);[31] Emanual Rivera (#146378); Cockrell (#245722);[32] and Brian Hagood (#183904).

Plaintiff seeks "copies of the misconduct, notice of intent and State Police investigation surrounding

this cell phone incident, March 2, 2002[,]" as well as "copies of all orders and rounds made in

segregation of plaintiff and Smith-Bey; Cockrell; King-El; Rivera-Bey; and Hagood-Bey[,]"

including "the logbook(s) and daily review sheets of cell checks by officers working in segregation

from March 2, 2002 until [August] 1, 2002."

On December 22, 2005, defendant filed a motion for protective order staying discovery.

(Doc. Ent. 24).  Relying upon Fed. R. Civ. P. 26(b)(2)(iii) and Fed. R. Civ. P. 26(c)(1), defendant

seeks a protective order staying discovery "pending resolution of the threshold issue[] of whether

[] defendant[] [is] entitled to judgment as a matter of law based on the absence of a genuine issue

of fact."  Doc. Ent. 24 at 2.  Referencing his pending dispositive motion, defendant contends that

"discovery is inappropriate at this stage of the proceeding, since the sole issue at this point involves

questions of law and the discovery sought by Plaintiff has no bearing on a determination of those

issues."  Doc. Ent. 24 at 4.

Plaintiff filed a response on January 6, 2006.  (Doc. Ent. 25).  He claims that defendant's

November 9, 2005 motion for summary judgment lacks merit, because plaintiff's December 12,

2005 proposed amended complaint deals "essentially with the alleged deficiencies in his [August

19, 2005] first amended complaint."  Plaintiff claims that defendant "has ignored the fact that a

second amended complaint [the December 12, 2005 proposed amended complaint] has been filed

---

[31]Prisoner #127317 is assigned to Lawrence Shipp.  *See* www.michigan.gov/corrections,
"Offender Search".

[32]Prisoner # 245722 is assigned to David Leduke.  *See* www.michigan.gov/corrections,
"Offender Search".

and this amended complaint satisfies all of the deficiencies claimed by defendant in his [November 9, 2005] motion for summary judgment."  (Doc. Ent. 25 at 3).

At least two of the requests, Nos. 4 and 9, seek information directly relating to the segregation of plaintiff and other alleged MSTA members, such as the notice of intent (CSJ-447) or the MSP investigation report.  Therefore, if the Court agrees with my conclusion that there is a question of material fact as to why plaintiff was placed into administrative segregation, it should deny defendant's motion for a protective order staying discovery.

**III.    NOTICE TO PARTIES REGARDING OBJECTIONS:**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505, 508-09 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).  Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically,

36

and in the same order raised, each issue contained within the objections.

s/Paul J. Komives

PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated 9/12/06

The undersigned certifies that a copy of the foregoing
order was served on the attorneys of record by electronic
means or U.S. Mail on September 12, 2006.

s/Eddrey Butts
Case Manager